RECEIVED
IN LAKE CHARLES, LA.

MAR - 6 2013

TONY R. MOORE, CLERK
BY_____
DEPUTY

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

MONIQUE L. BEANE,                    :    DOCKET NO. 2:10-CV-0781
INDIVIDUALLY AND AS NATURAL
TUTRIX OF THE MINOR CHILD,
JEB

VS.                                  :    JUDGE MINALDI

UTILITY TRAILER                      :    MAGISTRATE JUDGE KAY
MANUFACTURING COMPANY AND
TRUCK TRAILER MANUFACTUERS
ASSOCIATION

### MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [Doc. 242], filed by the defendant,

Utility Trailer Manufacturing Company ("UTM").  The plaintiff, Monique Beane, timely filed a

response [Doc. 286], and UTM then filed a reply [Doc. 302].  As the motion is fully briefed, the

undersigned finds that it is ripe for consideration.  For the foregoing reasons, UTM's Motion for

Summary Judgment is DENIED.

### BACKGROUND

In this lawsuit, the plaintiff claims damages as a result of a May 5, 2009 tractor-trailer

accident in which her husband, Robert Beane ("the decedent"), was killed when his Suburban

collided with a UTM trailer on U.S. Highway 1 in Caddo Parish.  The petition alleges that

Beane's Suburban struck the side of the UTM trailer at a ninety degree angle, causing his

Suburban to travel beneath (a collision the plaintiff describes as a "side underride") the trailer.[1]

---

[1] Pl.'s Compl., [Doc. 1-3], at ¶ 3.

The plaintiff originally filed this suit in the 36th Judicial District Court of Beauregard Parish, Louisiana.[2] The defendants then removed to this court based on diversity jurisdiction.[3] In a separate action ("Beane I"), the truck driver, his employer, and his insurance company settled with the plaintiff.[4] In this action ("Beane II"), the plaintiff originally sued the Truck Trailer Manufacturers Association ("TTMA") and UTM. She alleged that UTM had defectively designed the trailer involved in the decedent's accident, in violation of the Louisiana Products Liability Act ("LPLA"), and also asserted claims against UTM for negligence, punitive damages, and wrongful death damages.[5] She additionally alleged that the trade organization, TTMA, contributed to this defect by failing to recommend side underride protection to TTMA members like UTM, and providing false and misleading information to government agencies regarding underride issues.[6]

In a Memorandum Ruling issued February 2, 2011, this court dismissed TTMA based on lack of personal jurisdiction, and dismissed the plaintiff's claims for negligence, punitive damages, and wrongful death damages for pain and suffering against UTM, finding that the Louisiana Products Liability Act established the plaintiff's exclusive framework for recovery.[7] Thus, the plaintiff's sole claim remaining after this ruling was a claim against UTM that it had manufactured a trailer that, because it lacked side underride protection, was defective and

---

[2] *See generally id.*

[3] Not. of Removal, [Doc. 1].

[4] *Beane v. Ladislav*, case no. 2:09-cv-02030.

[5] [Doc. 1-3] at ¶ 4.

[6] *Id.* at ¶ 5.

[7] *See* Mem. Ruling, [Doc. 71] at pgs. 15 – 16. The court clarified that the plaintiff could still recover the specific wrongful death damages included in the LPLA for: loss of love, affection, companionship, service and support, and medical and funeral expenses, but could not recover physical pain and suffering damages under the LPLA. *Id.* at pg. 16.

unreasonably dangerous in design under the provisions of the LPLA.  *See* La. Rev. Stat. Ann. § 9:2800.54, *et seq.*

The parties' contention in this motion is whether the plaintiff's biomechanical expert, Dr. Paul France, actually addressed a specific alternative design to the UTM trailer which would have prevented the decedent's death or injuries.  The plaintiff retained Dr. Paul France as her expert in biomechanical engineering, and Dr. France rendered his written report in this matter on June 7, 2012 ("the France Report").[8]

While UTM alleges that the France Report does not identify or reference a particular alternative design that was capable of preventing the decedent's death,[9] the plaintiff counters that Dr. France did indeed describe and reference "effective and safe underride protection as an alternative design that was capable of preventing [the decedent's] death or injuries."[10]  Further, while UTM alleges that the France Report does not offer an opinion on whether the decedent would have survived a crash into a trailer equipped with the side guard proposed by the plaintiff's design experts, Bruce Enz and Perry Ponder,[11] the plaintiff expressly disavows this argument.  She argues that instead, it was Dr. France's unequivocal opinion that such protection would have prevented the fatal injuries sustained by the decedent.[12]  Finally, while UTM alleges that the France Report does not offer any opinion on how the decedent would have survived the

---

[8] Def.'s Statement of Uncontested Material Facts, [Doc. 242-2], at ¶¶ 5 – 6, Pl.'s Statement of Material Facts, [Doc. 293], at ¶¶ 5 – 6.

[9] [Doc. 242-2] at ¶ 8.

[10] [Doc. 293] at ¶ 8.

[11] [Doc. 242-2] at ¶ 10.

[12] [Doc. 293] at ¶ 10.

crash into a trailer equipped with Enz and Ponder's alternative design,[13] the plaintiff argues that it was Dr. France's unequivocal opinion that such protection would have resulting in non life-threatening, non-incapacitating injuries to the decedent.[14]

UTM now moves for summary judgment on the plaintiff's LPLA claim.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). If the dispositive issue is one that the nonmoving party bears the burden of proof at trial, the moving party may satisfy its burden by merely identifying evidence in the record that negates an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex,* 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

---

[13] [Doc. 242-2] at ¶ 11.

[14] [Doc. 293] at ¶ 11.

4

574, 587 (1986).  Ultimately, summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id*

## LAW & ANALYSIS

As this case's subject matter jurisdiction is premised on diversity of citizenship, the substantive law of Louisiana governs this dispute.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  As noted *supra*, in this instance, the plaintiff's claims against UTM are governed by the framework of the LPLA.  The plaintiff alleges that (1) UTM failed to implement or utilize designs that would have reduced or eliminated side underrides like the one experienced by the decedent and (2) the trailer was defectively designed and unreasonably dangerous because it lacked side guards.

The LPLA provides, *inter alia*:

> A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

> B. A product is unreasonably dangerous if and only if:

> (1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

> (2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

> (3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

> (4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

> C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product

5

left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

> D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

La. Rev. Stat. Ann. § 9:2800.54.

The LPLA then proceeds to define unreasonable dangerousness in design under §9:2800.56 as follows:

> A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damages; and

> (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

The plaintiff bears the burden of proving these elements. *See Krummel v. Bombardier Corp.*, 206 F.3d 548, 551 (5th Cir. 2000).

## I.     The Parties' Arguments

UTM argues that, as Dr. France's expertise as a biomechanical engineer involves "the application of engineering to medical science, the opinion of [the plaintiff's] biomechanical engineer is necessary to establish this essential element of [her] case:" namely, that the Enz Side Underride Guard ("Enz guard") proposed by Enz and Ponder would have prevented the decedent's death.[15]   As such, UTM alleges that the plaintiff's claim fails because she has failed, through Dr. France, to meet her burden on two elements of §9:2800.56: (1) Dr. France fails to address any specific alternative design, including the Enz guard, in either his report or

---

[15] Def.'s Mem. in Supp. of Mot. for Summ. J., [Doc. 242-1], at pg. 8.

deposition, and (2) Dr. France fails to address whether or to what extent the decedent would have been injured in a crash with a trailer equipped with such an alternative design.[16]  UTM argues that instead, Dr. France ignored the specific design proposed by Enz and Ponder, and addressed a "generic" concept of an unidentified alternative design, therefore not opining on how the Enz guard specifically could have mitigated the decedent's injuries.[17]  It further notes that Dr. France himself conceded in his deposition that the decedent would have still sustained injuries even if he had driven into a tractor trailer with a side guard.[18]

The plaintiff counters that UTM inappropriately attempts to "isolate" only part of the evidence in making its argument by solely focusing on Dr. France's testimony.[19]  She alleges UTM has ignored her other expert testimony (namely, that of her engineering experts, Enz and Ponder), who show that the plaintiff has offered a specific alternative design.[20]  The plaintiff argues that, in both Dr. France's report and deposition, Dr. France clearly stated: (1) effective side underride protection would have prevented the decedent's death; (2) what the decedent's injuries would have been had the trailer been equipped with side underride protection; and (3) the parameters of what he believed effective side underride protection to be.[21]  She further argues that the reason Dr. France did not discuss a specific alternative design in his deposition is because UTM failed to ask him about a specific alternative design.[22]  To clarify Dr. France's

---

[16] *Id.* at pgs. 11 – 12.

[17] *Id.* at pg. 9.

[18] *Id.* at pg. 11.

[19] Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J., [Doc. 286], at pg. 2.

[20] *See id.* at pg. 6.

[21] *Id.* at pg. 3.

[22] *Id.*

position, the plaintiff has submitted with her response an affidavit from Dr. France in which he expressly notes that the Enz guard would have prevented or mitigated Beane's injuries.[23]  She has also included affidavits and materials from Ponder and Enz, corroborating this claim.[24]

UTM counters, in its reply, that "facing summary judgment for failure to satisfy the [specific alternative design] requirement of the LPLA, Plaintiff has now attempted to re-invent the case by adding an impermissible new opinion from Dr. France [in the form of his new affidavit]."[25]  It argues that Dr. France's affidavit is based on his post-deposition review of new information (namely, information on the Enz guard) which he did not have when he prepared his report.[26]  Citing to pages 74 – 75 of his deposition, UTM shows that Dr. France acknowledged that he did not address the particular design of the Enz guard in his report on medical causation.[27]  It argues that it is disingenuous for Dr. France to now submit an affidavit and say that since that time, he has reviewed Enz's design and decided that it would have provided safe and effective protection for the decedent in his accident.[28]

Continuing, UTM alleges that it is equally puzzling and disingenuous for the plaintiff to claim that the only reason Dr. France did not discuss the Enz guard in his deposition was because UTM did not ask him about the Enz guard, particularly in light of the fact that Dr. France's report, which was purportedly a complete statement of all his opinions, made no references to the

---

[23] "Affidavit of Paul France," Ex. B to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-2].

[24] Perry Ponder Affidavit, Deposition, CV, and Materials, Exs. E – H to Pl.'s Opp. to Mot. for Sunm. J., [Docs. 286-5 thru 286-8], Bruce Enz Affidavit, Deposition, and CV, Exs. I – K to Pl.'s Opp. to Mot. for Summ. J., [Docs. 286-7 thru 286-11].

[25] Def.'s Reply to Mot. for Summ. J., [Doc. 302], at pg. 1.

[26] *Id.* at pg. 2.

[27] *Id.* at pg. 3.

[28] *Id.* at pg. 4.

Enz guard.[29] UTM then repeats its arguments from its original motion that the proposed design

must be specific.  It argues that the plaintiff has failed in her burden of proving that the Enz

guard would have mitigated the decedent's injuries by failing to produce specific evidence on the

extent to which the decedent would have been injured in a crash with the Enz guard.[30]

Rounding out its reply, UTM addresses the plaintiff's expert, Perry Ponder.  Ponder has

been offered by the plaintiff to testify on a large slate of issues, including injury causation and

how the Enz guard would have reduced the decedent's injuries.  UTM notes that Ponder was the

subject of a *Daubert* motion, in which UTM moved to exclude his opinions on injury causation

on the theory that Ponder is not a biomechanical engineer.[31]  Thus, UTM asserts that if the court

determined that Ponder may not testify on injury causation because he lacks qualifications, the

entire house of cards collapses, as Dr. France's opinion cannot stand alone on this crucial issue

of causation.[32]  UTM closes by noting that, even if Ponder were allowed to testify on injury

causation, he certainly is not qualified to opine on the extent of physical injuries the decedent

would have suffered if UTM's trailer had had an Enz guard.[33]

## II.    Legal Analysis

### A.  Dr. France's Affidavit is Inadmissible Summary Judgment Evidence

The undersigned will first address the plaintiff's submission of Dr. France's affidavit, in

which Dr. France asserts that, after he wrote his report and was deposed by UTM, he "reviewed

additional materials including certain reports, depositions, and affidavits pertaining to this case[,

---

[29] *Id.* at pg. 6.

[30] *Id.* at pg. 7.

[31] *Id.* at pg. 8.

[32] *Id.*

[33] *Id.* at pg. 9.

including] those from Mr. Bruce Enz . . . and Mr. Perry L. Ponder."[34]  He then opines that, based on this new information, the Enz guard "provides effective and safe under ride [sic] protection in collisions similar to that experienced in the Beane Case" because the guard "would have moved the injury potentials, severity, and eventual outcome for [the decedent] from levels consistent with fatal injuries to non-life threatening injuries related to seat belt and air bag contact and potential lower leg contact injuries."[35]

Among other things, an expert's report must contain a "complete statement of all opinions the witness will express," and "the facts and data considered by the expert." Fed. R. Civ. P. 26(a)(2)(B)(i – ii).  On the eve of summary judgment, Dr. France's opinion that he is specifically adopting the Enz guard is contained nowhere in his expert report.  The plaintiff argues that she is simply clarifying the issue in light of the fact that UTM never asked Dr. France about the Enz guard.  Her arguments on this point are misplaced.

The Sixth Circuit case *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010) is instructive on what an expert must disclose in his report.  In *Olmstead*, the plaintiff, Olmstead, retained one expert, Reid, who would provide testimony on whether the defendant, CUI, had copied the plaintiff's software. *Id.* at 271.  The district court granted the defendant's motion to exclude use of Reid's testimony, finding that his report failed to comply with five out of the six expert report disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B). *Id.* at 268.  On appeal, the Sixth Circuit addressed the deficiencies in Reid's report, noting that the "[m]ost troubling of the violations that the district court described is Reid's failure . . . to give 'a complete statement of all opinions the witness will express and the basis and reasons for them.'"

---

[34] Dr. France Affidavit, Ex. B. to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-2].

[35] *Id.*

*Id.* at 271 (citing Fed. R. Civ. P. 26(a)(2)(B)(i)).  It noted that Reid had provided only "cursory

support" for his conclusion that the defendants had copied the plaintiff's software, particularly

because he had failed to discuss the basis of his conclusion that the alleged similarities between

the two parties' software was because of the alleged copying.  *Id.*  The Sixth Circuit then closed

by finding:

> Under Rule 26(a), a "report must be complete such that opposing counsel is not
> forced to depose an expert in order to avoid an ambush at trial; and moreover the
> report must be sufficiently complete so as to shorten or decrease the need for
> expert depositions and thus to conserve resources." *Salgado v. Gen. Motors
> Corp.,* 150 F.3d 735, 742 n. 6 (7th Cir.1998) (citing *Sylla-Sawdon v. Uniroyal
> Goodrich Tire Co.,* 47 F.3d 277, 284 (8th Cir.1995)).  "Expert reports must
> include 'how' and 'why' the expert reached a particular result, not merely the
> expert's conclusory opinions." *Id.*  Reid's report plainly failed to clear this hurdle.

*Id.*

In this case, Dr. France's conclusions on the Enz guard are completely new and not

contained in his report.  As in the *Olmstead* case, UTM was not required to depose Dr. France

about the Enz guard in order to avoid an "ambush at trial."[36]  Indeed, UTM *did* ask Dr. France

about the Enz guard in his deposition, and while Dr. France acknowledged that he had seen some

testing done with the Enz guard,[37] he stated that he had not considered it in making his report.[38]

---

[36] Additionally, the undersigned must remind the plaintiff that *she* bears the burden of proving the elements of her
LPLA claim at trial.  Thus, assertions that UTM's claims fail because it did not ask about certain issues in a
deposition improperly place the burden on UTM.

[37]The relevant portion of Dr. France's deposition is as follows:

UTM counsel: "You've examined the performance of side underride guards?"

Dr. France: "I've presented materials in – in the Baker case and in this case of tests have been
accomplished on the Enz side – SURG system and – have seen the results of collision tests associated with
those systems."

France Deposition at pg. 102, [Doc. 242-5].

[38] The relevant portions of Dr. France's deposition is as follows:

Further, the undersigned finds that the cases the plaintiff cited for the proposition that she can submit an affidavit to clarify Dr. France's position clearly do not apply here, where Dr. France is offering an entirely new specific opinion on the Enz guard. *See McPherson v. Rowe*, 366 Fed. App'x. 43 (11th Cir. 2010) (allowing the inclusion of new information not included in an expert report, particularly because the experts were not testifying to new opinions based on new information); *Graves ex rel. W.A.G. v. Toyota Motors Corp.*, 2012 WL 38894 (S.D. Miss. Jan. 9, 2012) (allowing the inclusion of opinions "clearly articulated" in the report); *Allen v. Ford Motor Co.*, 2010 WL 3791037 (E.D. Tex., Sept. 23, 2010) (allowing an affidavit to clarify an opinion taken out of context in a deposition).

Thus, the undersigned will not consider Dr. France's affidavit expressly adopting the Enz guard for the determination of this motion, particularly in light of the fact that its inclusion would be harmful to UTM on the eve of summary judgment and weeks before trial. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless.").

## B. Effect of *Daubert* Motion Ruling on Ponder

---

UTM counsel: "And there's nothing in your report regarding a side underride guard or protection designed or offered by Bruce Enz.  True?"

Dr. France: "Correct.  It's not – I didn't address this particular design in my report."

*Id.* at pg. 75.

UTM counsel: ". . . have you – have you ever seen side underride protection on the road on a trailer?"

Dr. France: Not that I would designate that way.  But I – I've seen things hanging down underneath that would function, I think, in that way. . . But I haven't seen one like the Enz system have --  have been designed for."

*Id.* at pg. 101.

The undersigned next turns to UTM's argument that its motion for summary judgment here is dependent on this court's ruling on its *Daubert* motion for Ponder. A hearing on UTM's *Daubert* motion for Ponder was conducted on February 26, 2013. The undersigned granted the motion, but only to the limited extent that Ponder could not testify on a "conspiracy theory" with the TTMA, and could not use data from Enz guard crash tests (which the court found were not substantially similar to this case's accident) to show how an Enz guard would have specifically performed in this case's accident.[39] On the issue of whether Ponder could testify about medical causation despite his lack of experience in biomechanical engineering, the undersigned notes that since Ponder is an engineer, and not a medical expert, he is allowed to testify from an engineering perspective – i.e., focusing on engineering probabilities around the accident, and not medical probabilities. *Polston v. Boomershine Pontiac–GMC Truck, Inc.*, 952 F.2d 1304, 1309 (11th Cir.1992) (holding that mechanical engineer "was not qualified to testify to medical probabilities. However, as discussed above, [he] was qualified as an expert and was allowed to testify about [plaintiff's] injuries based on a reasonable degree of engineering certainty."). The same would apply to Bruce Enz, the plaintiff's other expert mechanical engineer. For the reasons discussed in more detail below, combining Ponder's and Enz's engineering testimony with Dr. France's biomechanical engineering testimony, the plaintiff has still created a question of material fact on the proposed alternative design being capable of preventing the decedent's injuries.

### C. Despite the Failure of Dr. France's New Affidavit, The Plaintiff Has Created a Fact Issue on a Specific Alternative Design Capable of Preventing Beane's Damage

#### 1. Specific Alternative Design

---

[39] Minutes for Feb. 26, 2013 *Daubert* Hearing [Doc. 358].

13

Under the LPLA, the plaintiff bears the burden of demonstrating a specific alternative design. La. Rev. Stat. § 9:2800.56(1).  Addressing UTM's argument that Dr. France himself should have specified a particular alternative design/side guard for the UTM trailer, UTM has cited a string of cases for the general proposition that "a proposed alternative design submitted to prove §9:2800.56 must be specific."[40]  While this is the general holding of each of the cases cited by UTM, the undersigned notes that none of these cases support UTM's actual argument: that the burden of producing a proposed alternative design rests squarely on the shoulders of a party's biomechanical engineer.

For example, in *Gray v. Industrial Plant Maintenance*, 2004 WL1661209 (E.D. La., July 23, 2004), the Eastern District of Louisiana's Judge Vance found that the plaintiff had not met his burden of producing a specific alternative design for a tractor because the plaintiff had "submit[ted] no drawing, specification, model, sample, calculation, photograph, or expert opinion on his proposed alternative design. He merely describes [the alternative design] generically as having a cutoff switch and a cover of some sort over the PTO shaft." *Id.* at *5.   In another opinion cited by UTM, *Andrews v. Dufour*, 2003-0736 (La. App. 4 Cir. 6/2/04), 882 So.2d 15, the Louisiana Fourth Circuit addressed whether a plaintiff had provided sufficient proof that his proposed alternative design for a gas tank (a plastic shield which would attach to the bottom of the tank) would have prevented the accident. *Id.* at 25.  Instructive to the court was the fact that the plaintiff's expert had not done any testing on this plastic shield to determine whether the shield could have prevented a puncture to the plaintiff's gas tank, or even what the shield would have looked like. *Id.* at 25 – 26.  Finally, in *Jager v. Automotive Cas. Ins. Co.*, 95-2448 (La. App. 4 Cir. 10/9/96); 682 So. 2d 292, the court found that the plaintiff had failed to

---

[40] [Doc: 242-1] at pg. 12.

prove a design defect in a seatbelt in an American car by simply pointing out that European seat belts were designed differently. *Id.* at 298.

Reviewing Dr. France's report, he opined that the decedent's injuries would have been "below fatal standards" if the UTM trailer had included a device that eliminated underride.[41] He noted that the Suburban's underride of the UTM trailer led to a "major intrusion into the front occupant compartment" which prevented the air bag systems from functioning properly.[42] Thus, Dr. France reasons that if side underride protection had been in place to prevent the major intrusion, the decedent's seat belt and airbag system would have worked properly.[43] Further, the point of impact on the Suburban would have been the front of the Suburban, as opposed the windshield area, which Dr. France reasons would have "moved the injury potentials, severity, and eventual outcome for Officer Beane from levels consistent with fatal injuries to non-life threatening injuries related to seat belt and air bag contact and potential lower leg contact injuries."[44] If Dr. France's report were all that the court had, then this would be insufficient for the plaintiff to withstand summary judgment on the specific alternative design issue. By limiting the inquiry to Dr. France's deposition and report, however, UTM ignores the task of a court in a motion for summary judgment: to look at the record as a whole. *See Matsushita,* 475 U.S. at 587.

The testimony of Enz and Ponder comes in as the complementary missing puzzle pieces to this inquiry, by providing a specific proposed alternative design: the Enz guard, which is described in detail by the plaintiff's design experts, Enz and Ponder. While Dr. France admittedly did not specifically mention the Enz guard in his report or deposition, Enz and

---

[41] Dr. France Report, Ex. A to Def.'s Mot. for Summ. J., [Doc. 242-4], at pg. 4.

[42] *Id.*

[43] *See id.*

[44] *Id.*

Ponder's reports, affidavits, and deposition testimony fill in that gap and work together to create a fact issue on the specific alternative design requirement of §9:2800.56.  Such is the case in many trials: one expert seldom carries the burden of producing evidence on every single element of a case.  In this instance, essentially, Dr. France sets the scene: he opines that if UTM's trailer had had side underride protection which prevented underride and "occupant space intrusion" (essentially, the trailer chopping or crushing the top of the vehicle off as it underrides the trailer), then the decedent's airbags would have deployed.  Further, the collision impact spot on the Suburban would have been moved from the windshield to the front of the Suburban, changing his injuries from fatal to non-fatal.  Ponder and Enz then round out the inquiry by producing data that such side underride protection exists in the form of the Enz guard.

### 2. Whether the Specific Alternative Design was Capable of Preventing The decedent's Damage

Finally, the undersigned turns to UTM's argument that Dr. France did not address whether a specific alternative design would have been capable of preventing the decedent's damage.[45]  As a sidenote, UTM appears to lodge a *Daubert* attack on Dr. France's qualifications to opine on this issue in this section of its argument, arguing that "Dr. France has spent more time during the last there years 'doing individual and marriage counseling' at a family counseling center" than practicing in the field of biomechanical engineering.[46]  UTM also appears to challenge Dr. France's methodology in coming to his conclusions.[47]

The undersigned notes that if UTM had wished to file a *Daubert* motion against Dr. France as an expert, then the appropriate channel would have been to file a separate *Daubert*

---

[45] [Doc. 242-1] at pg. 13.

[46] *Id.* at pg. 14.

[47] *Id.*

motion, and not instead tuck *Daubert* arguments into a motion for summary judgment.
Reviewing the information provided on Dr. France, however, the undersigned still finds him
qualified to testify.   Under Rule 702, an expert's qualifications may derive from knowledge,
skill, experience, training, or education. "[A]s long as an expert stays within the reasonable
confines of his subject area, our case law establishes a lack of specialization does not affect the
admissibility of the expert opinion, but only its weight." *Ralston v. Smith & Nephew Richards,
Inc.,* 275 F.3d 965, 970 (10th Cir.2001) (quoting *Compton v. Subaru of Am., Inc.,* 82 F.3d 1513,
1520 (10th Cir.1996)) (quotation marks and alteration marks omitted); *see also Zuchowicz v.
United States*, 140 F.3d 381, 387 (2d Cir.1998) ("[D]isputes as to the strength of his credentials,
faults in his use of differential etiology as a methodology, or lack of textual authority for his
opinion, go to the weight, not the admissibility of his testimony."). Here, reviewing Dr. France's
CV,[48] the undersigned is certain that Dr. France is qualified to testify in the area of
biomechanical engineering, despite his admitted recent focus on individual and marriage
counseling.

On the reliability issue, whether an expert's testimony is reliable requires "an assessment
of whether the reasoning or methodology underlying the testimony is scientifically valid." *Curtis
v. M & S Petroleum, Inc.,* 174 F.3d 661, 668 (5th Cir.1999). "The proponent need not prove to
the judge that the expert's testimony is correct, but she must prove by a preponderance of the
evidence that the testimony is reliable." *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th
Cir.1998) (en banc).  It is then the district court's responsibility to "make certain that an expert,
whether basing testimony upon professional studies or personal experience, employs in the
courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

---

[48] Dr. France CV, Ex. D to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-4].

relevant field." *Kumho Tire,* 526 U.S. at 152; *Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed. App'x. 395, 397 – 98, 2007 WL 3283750, *2 (5th Cir. 2007).

Addressing Dr. France's methodology in coming to his conclusions, UTM cites to the unpublished case, *Layssard v. U.S.*, 2007 WL 4144936 (W.D. La. Nov. 20, 2007), in which the court excluded a biomechanical engineer from testifying in a Federal Tort Claims Act case (involving a low speed automobile accident between the plaintiff in a Chevrolet and an Army vehicle operated by an Army employee) after a *Daubert* challenge was lodged against him. *Id.* at *1. The court first found that because the expert was a biomechanical engineer and *not* a doctor, it would " at least preclude [the expert] from testifying as to medical causation and would limit his testimony to the forces involved in the collision and whether or not these would generally lead to injury." *Id.* at *3. Next, the court found that the expert's testimony should be excluded because his opinion that a low speed collision (like the one at issue in the case) would not normally lead to injury was an obvious conclusion, and thus expert testimony was unnecessary. *Id.* at *4. Finally, the court concluded that the expert's testimony should be excluded because it was not based on reliable methodology: instead, he simply reviewed eleven photographs from the incident, an accident report, general information on vehicles in the crash, and repair estimates on the plaintiff's car. *Id.* The court took particular issue with the fact that the expert did not make any calculations in coming to his conclusions, instead simply asserting that his estimate was accurate based on his prior experience reconstructing "a hundred and fifty or so accidents." *Id.* It also flagged the issue that the expert did not seem to take into account how much the difference the weight of the Army vehicle and the Chevrolet would play in determining the severity of the collision. *Id.*

Turning to his report, Dr. France was tasked with "examin[ing] the evidence surrounding the subject accident and . . .forumlat[ing] opinions related to injury mechanisms and the change in injury result for [the decedent] if the Utility Trailer had been equipped with side underride protection."[49]  In his deposition, Dr. France acknowledged that he had relied on the reconstruction information (and the calculations therein) from Mr. Irwin, the plaintiff's accident reconstruction expert, in making his conclusions.[50]  He also admitted that Mr. Irwin had not provided him with any hypothetical crash data for a crash that occurred with a specific side underride guard.[51]  Dr. France then walked through the decedent's injury mechanisms from the crash, explaining in detail how the impact of the trailer caused the decedent's injuries.[52]  His methodology and reliability up to this point are sound, and certainly more exact than those of the expert in *Layssard*.  The one flaw in Dr. France's analysis is that he did not have any crash test data from a tractor trailer that had any sort of side underride protection on it. He instead opined in general that "[h]aving effective side underride protection on the Utility trailer at the time of the subject accident would have moved the injury potentials, severity, and eventual outcome for [the decedent] from levels consistent with fatal injuries to non-life threatening injuries related to seat belt and air bad contact and potential lower leg contact injuries."[53]

As with the specific alternative design, here too Ponder and Enz are required to fill in the gaps of Dr. France's conclusions, as alone Dr. France certainly would not be sufficient to prove

---

[49] [Doc. 242-2] at pg. 3.

[50] Dr. France Deposition, Ex. to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-3], at 74: 18 – 24.  Irwin was not the subject of a Daubert challenge, and his conclusions also are essentially identical with those provided by UTM's accident reconstruction expert, Dr. Stephen Werner.

[51] *Id.* at 75: 3 – 15.

[52] *Id.* at 76 – 79.

[53] [Doc. 242-4] at pg. 4.

this element of the plaintiff's LPLA claim.  To reiterate, under La. Rev. Stat. § 9:2800.56, the plaintiff has the burden of proving, among other things, that, at the time the product left the manufacturer's control, there existed an alternative design for the product that was capable of preventing the claimant's damages.  Courts in Louisiana have held that a plaintiff asserting an LPLA claim must prove that the alternative design was capable or would have been "significantly less likely" than the chosen design to cause the claimant's complained of damages, or that the alternative design would have significantly reduced such damage.  *See Johnson v. Black & Decker U.S., Inc.*, 29996 (La. App. 2 Cir. Oct. 31, 1997); 701 So. 2d 1360, 1363.

Ponder will testify on, among other things, the "engineering calculations to determine both the strength and energy absorption of various SURGs including the [Enz guard]."[54]  He notes in his affidavit that he reviewed the information available on the decedent's accident, the accident reconstruction information from Dr. Irwin, and crash testing done on the Enz guard and other SURGs.[55]  Using the method performed by the National Highway Safety Association, he calculated the forces and stresses that would have been involved in the decedent's accident had the Enz guard been present.[56]  Based on all of his calculations, he concluded that "had the Utility trailer been equipped with [Enz] side guards . . . (i) the side guard would have withstood the impact [in the decedent's accident] (ii) would have prevented underride and, more importantly, passenger compartment intrusion and (iii) would have been a survivable accident.[57]

Enz provides similar testimony.  He notes in his affidavit that the crash testing conducted on the Enz guard will show in general the "engineering principles, dynamics, and physics

[54] Ponder Affidavit, Ex. E to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-5], at pg. 3.

[55] *Id.* at pgs. 4 –5.

[56] *Id.* at pg.

[57] *Id.* at pg. 7.

involved in real world side underride incidents involving many angles. . . speeds and vehicles."[58]
Based on this testing and other research he has conducted, Enz concludes that "passenger vehicle
occupant protection systems are negated in side underride collisions without a side underride
protection device but that these same systems function correctly and timely with the presence of
side underride protection devices, therefore providing a higher level of safety to the
occupants."[59]  Concluding, he asserts that based on his familiarity with the information on the
decedent's accident and the properties of his Enz guard, if the Enz guard had been on the UTM
trailer, "the [decedent's vehicle] would not have underrode the subject trailer, would have
prevented the catastrophic occupant compartment intrusion, and would have allowed the
occupant protection safety systems to function correctly and timely to protect [the decedent]."[60]

While for the reasons discussed *supra*, Ponder and Enz cannot specifically testify about
medical probability of survivability based on the crash forces in the decedent's case, they can at
least provide the needed follow up missing from Dr. France's report on the mechanical
properties of the Enz guard and how it would have performed in an accident such as this one.  It
would have been preferable, of course, for Dr. France to have specific side guard crash test
information in order to make his conclusions on the biomechanical forces at play in this accident
and an accident with a side guard.  Indeed, this flaw certainly weakens the plaintiff's case, as
does the fact that the undersigned has already found that the Enz side guard crash testing is not

---

[58] Enz Affidaviat, Ex. I to Pl.'s Opp. to Mot. for Summ. J., [Doc. 286-9], at pg. 4.

[59] *Id.* at pg. 5.

[60] *Id.* at pg. 7.  UTM once again cites to dissimilar case law in support of its argument that the plaintiff has not created a question of material fact on the alternative design's capability to prevent the decedent's injuries. Specifically, she cites to *Seither v. Winnebago Indus., Inc.,* (La. App. 4 Cir. 7/2/03); 853 So. 2d 37, an LPLA case involving a Winnebago.  At the trial court level, the jury found Winnebago forty percent at fault and the Winnebago dealer thirty percent at fault. *Id.* at 39.  All parties subsequently appealed.  On appeal, the Fourth Circuit found that the plaintiffs had not presented a valid alternative design for the Winnebago: they had merely presented "a concept that was untested, unengineered, and not presented to the jury in any fashion more than mere speculation" *Id.* at 41.

substantially similar enough to come in as evidence of what would have specifically happened in the decedent's accident.

Construing the evidence in the light most favorable to the plaintiff, and looking at the record as a whole, however, the undersigned finds that it is premature to grant summary judgment on the plaintiff's LPLA claim based on these shortcomings. The issue of just how effective the plaintiff's proposed alternative design may be, and whether it would have reduced the decedent's injuries from fatal to non-fatal, is instead more properly an issue to be determined by the jury, who must assess for themselves the reliability and weight to afford Ponder and Enz's expert testimony.

## CONCLUSION

Because the evidence demonstrates that there is a material issue of fact concerning the existence of a proposed alternative design for UTM's trailer and whether that alternative design could have prevented Beane's death, UTM's Motion for Summary Judgment must be denied.

Lake Charles, Louisiana, this ___6___ day of ___March___ 2013.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE